**COLLEGES AND UNIVERSITIES**

COMMUNITY COLLEGES – COUNTIES – CHARTER HOME RULE
   COUNTIES – APPLICABILITY OF "SPENDING
   AFFORDABILITY" PROCESS TO COMMUNITY COLLEGE'S
   TUITION REVENUE


July 21, 1994


*The Honorable Laurence Levitan*
*Maryland Senate*


You have requested our opinion whether Montgomery County may apply its "spending affordability" process to the portion of the budget of Montgomery College that is derived from tuition and fees.

For the reasons stated below, we conclude that the county may do so.


**I**

**Background**

*A.   Spending Affordability Process*

Under §305 of the Montgomery County Charter, the County Council has been given very broad authority over the budget: "The Council may add to, delete from, increase or decrease any appropriation item in the operating or capital budget." Two charter amendments have channelled this discretion, however, by imposing procedural hurdles to sizeable budget increases.

In 1978, the citizens of the county approved an amendment to §305 to impose a supermajority approval requirement for certain increases in an agency's operating budget: "An aggregate operating budget which exceeds the aggregate operating budget for the preceding fiscal year by a percentage increase greater than that of the Consumer Price Index for all urban consumers for the Washington

metropolitan area for the twelve months preceding December first of each year requires the affirmative vote of six Councilmembers."

In 1990, the voters strengthened this fiscal control by adding a "spending affordability" requirement for budget preparation: "The Council, sitting as a spending affordability committee, shall annually adopt spending affordability guidelines for the capital and operating budgets, including guidelines for the aggregate capital and aggregate operating budgets.... Any aggregate capital budget or aggregate operating budget that exceeds the guidelines then in effect requires the affirmative vote of seven Councilmembers for approval."

The operating budgets of certain entities are excluded from these requirements.[1] There is no comparable exclusion for Montgomery College, although we understand that a charter amendment to exclude the college's tuition, fees, and grant receipts is now under consideration.

As we understand the situation, in three of the four budget cycles since the 1990 Charter Amendment took effect, the County Council has applied the spending affordability process to every revenue source that contributes to the college's aggregate operating budget. *See* §20-59(a) of the Montgomery County Code (definition of "aggregate operating budget").[2] The net effect of applying spending affordability in this way is to negate budget expansions that would otherwise be funded by increased tuition revenues, because

---

[1] The exclusion is as follows: "For the purposes of this section, the aggregate operating budget shall exclude operating budgets for enterprise funds, the Washington Suburban Sanitary Commission, the bi-county portion of the Maryland-National Capital Park and Planning Commission, and the Washington Suburban Transit Commission." *See* 64 *Opinions of the Attorney General* 35 (1979).

[2] In one year, the Council apparently excluded tuition and fees from the spending affordability process. We do not comment on the proper interpretation of the Charter provision and its implementing legislation. We likewise express no view whether any of the college's revenues are properly to be considered an "enterprise fund" and therefore excluded from the spending affordability process. *See* note 1 above. These matters call for an interpretation of county law not appropriate for the Attorney General's office.

the college's budget is subject to a "spending allocation" that fits the college's entire budget (including tuition and other non-county revenue sources) within the overall ceiling on appropriations. *See* §§20-60 and 20-63 of the Montgomery County Code. Spending affordability effectively transforms the college's budget into a vessel of fixed volume, into which the County Council first pours all revenue other than county tax revenues. The greater the volume of these other revenues, the fewer county tax dollars are needed to meet the college's allocation. Extra tuition revenue results not in programmatic expansion but a proportional decline in county support. The County Council can then apply tax dollars that would otherwise have been allocated to the college, were it not for the extra tuition revenue, to other budget items without exceeding the overall affordability ceiling.

The college argues that this system creates perverse management disincentives for the college and threatens its ability to deliver quality education to the 30,000 students who take courses there. While these may be cogent points in the policy debate about the proposed charter amendment, our task is the narrower one of discerning whether the application of the spending affordability process to tuition revenue is contrary to State law.

## B.    *Education Article Provisions*

The Board of Trustees of Montgomery College is generally empowered by State law to manage the affairs of the College. §§16-201 and 16-203 of the Education ("ED") Article, Maryland Code. The board has specific authority to set "tuition and fees." ED §16-203(j).

The board does not have ultimate authority over its own budget, however. Under ED §16-401(a), the board must submit its operating and capital budgets to the Montgomery County Council. The board's operating budget must include "*all revenues* ... and sources of income, including ... [a]ny funds from federal, State, and local sources ...." ED §16-401(b) (emphasis added). The County Council has authority to "review and approve the budget of the community college and may reduce it." ED §16-401(e). Finally, ED §16-401(d) provides that capital and operating budgets must be prepared and considered "in accordance with county fiscal procedures not inconsistent with State law."

**II**

**Analysis**

If either the spending affordability process itself or the supermajority voting requirements that are a part of it conflicted with State law when applied to Montgomery College, the charter provision would be of no legal effect. "When a provision of a county charter conflicts with a public general law, the public general law prevails ...." *Rosecroft Trotting and Pacing v. Prince George's County*, 298 Md. 580, 599, 471 A.2d 719 (1984). *See* Article XI-A, §1 of the Maryland Constitution. *See also* ED §16-401(d) (county fiscal procedures must be "not inconsistent with State law"). "Nevertheless, '[w]herever reasonably possible, courts will construe enactments so that there is no conflict.'" *Board of Elections v. Smallwood*, 327 Md. 220, 242, 608 A.2d 1222 (1992) (quoting *Town of Forest Heights v. Frank*, 291 Md. 331, 337, 435 A.2d 425 (1981)).

If the Montgomery County Council sought to instruct the Board of Trustees of Montgomery College not to raise tuition, we have no doubt that such an action would conflict with the grant of authority to the Board in ED §16-203(j). *See Prince George's County v. Board of Trustees*, 271 Md. 21, 313 A.2d 678 (1974). Likewise, if the County Council sought to divert college tuition revenue to fund some county program or agency, that action would be inconsistent with the evident aim of the statute that the college's funds be managed by the college for the institution's benefit. *See* ED §§16-203(c) and (h), 16-405(b), and 16-406(b).

The spending affordability process, however, does neither of these things. The process leaves the Board of Trustees free to set tuition rates at whatever level it wants and to use all of the revenue derived from tuition for college purposes. Of course, increased tuition revenue translates into decreased county support. But that is simply another way of describing something that the County Council has undoubted power to do − cut the college's budget. State law requires the County Council to approve the college's proposed budget, authorizes the Council to reduce it, and requires that "all revenues" be included in it. ED §16-401(b), (d), and (e). Under this statutory scheme, the college has no entitlement to a budget of any particular size, notwithstanding its own power to raise revenues.

Nor is the college entitled to any minimum level of county funding. At one time, ED §16-403 did require a minimum county contribution. But in Chapter 465 of the Laws of Maryland 1991, the General Assembly substituted a "maintenance of effort" requirement for a minimum funding requirement. *See* ED §16-403(c).[3]

The college suggests that the supermajority requirements in §305 of the Charter are inconsistent with ED §16-401(e), because the latter provision authorizes the County Council to "review and approve the budget of the community college" but does not authorize a supermajority vote for the approval. Relying on *Mossburg v. Montgomery County*, 329 Md. 494, 620 A.2d 886 (1993), the college suggests that the omission of any express authorization in ED §16-401(e) for a supermajority means that the Council may not adopt one.

*Mossburg* involved a challenge to a supermajority requirement in Montgomery County's zoning ordinance. Under the ordinance, most decisions by the Board of Appeals were made by ordinary majority vote of the five-member board. Approval of a special exception, however, required a supermajority of four votes. An individual whose application for a special exception failed because it gained only three votes (a majority) instead of four votes (the required supermajority) challenged the validity of the four-vote requirement.

The Court of Appeals held that Montgomery County was not authorized to adopt a supermajority voting requirement for the Board of Appeals. Looking to the Regional District Act, the source of Montgomery County's zoning authority, the Court pointed out that the language of the section dealing with special exceptions "does not expressly state that a county may require a supermajority in special exception cases." 329 Md. at 504. Moreover, the Court identified instances in the very same act in which the General Assembly either itself provided for a supermajority or expressly authorized a county to adopt a supermajority requirement if the county so chose. "Provisions such as these indicate that where the General Assembly

---

[3] The difference is that the County now is under no legal obligation to provide any particular amount of money to the college. If the Council fails to "provide operating fund appropriations in an amount not less than the county provided in the previous fiscal year," however, the college would lose incremental State financial assistance to which it would otherwise be entitled. ED §16-403(c).

has intended to authorize a supermajority requirement, it has done so expressly." 329 Md. at 505. Finally, the Court explained that a supermajority voting requirement was inconsistent with the adjudicatory nature of a special exception proceeding. 329 Md. at 506-07.[4]

In our view, *Mossburg* is distinguishable and does not lead to the conclusion that the supermajority requirements in §305 of the County Charter are inconsistent with the budget review and approval power given to the County Council in ED §16-401.

To be sure, ED §16-401, like the provision on special exceptions at issue in *Mossburg*, "does not expressly state that a county may require a supermajority in [approving a community college's budget]." 329 Md. at 504. But, unlike the Regional District Act, ED Title 16 contains no provision at all dealing with the majority required to approve decisions. In other words, there is no evidence in ED Title 16 that the General Assembly ever focused on the question and impliedly decided to preclude supermajority voting, as the General Assembly evidently did in the special exception provision in the Regional District Act.[5]

Furthermore, the County Council's approval of the college's budget is purely a legislative act, quite unlike the adjudicatory decision-making at issue in *Mossburg*. There is no judicial review of the County Council's budget decision, and there is nothing incompatible between a supermajority voting requirement and the nature of that decision. Thus, we do not believe that the rationale of *Mossburg* applies here.

---

[4] Judicial review would be difficult or impossible, the Court observed, if the agency's rationale in an adjudicatory proceeding were something other than the views of the agency's majority. 329 Md. at 508.

[5] In 73 *Opinions of the Attorney General* 6, 7 (1988), we concluded that, when a statute authorized action to be taken by "a majority of the members who are present and eligible to vote," a state agency could not adopt a stricter voting requirement. By contrast, the statute dealing with the County Council's approval of the college's budget simply does not address the votes required for approval.

Even if there is no conflict with statute, we recognize, local legislative bodies generally "lack power to adopt quorum or voting requirements stricter than the common law." 73 *Opinions of the Attorney General* 6, 9 (1988) (citing *Heiskel v. City of Baltimore*, 65 Md. 125 (1886), and *Murdoch v. Strange*, 99 Md. 89 (1904)).

A *charter provision* calling for supermajority approval stands on a different footing than the rules discussed in those cases or the Attorney General's opinion, however. "[A] county charter is equivalent to a constitution." *Board of Elections v. Smallwood*, 327 Md. at 237. A constitution can establish a supermajority voting requirement, of course. "'Where a quorum is present the act of the majority of the quorum is the act of the body. This has been the rule for all time, *except so far as in any given case the terms of the organic act under which the body is assembled have prescribed specific limitations*.'" *Zeiler v. Central Railway Co.*, 84 Md. 304, 322 (1896) (quoting *United States v. Ballin*, 144 U.S. 1, 6 (1892)) (emphasis added).

In our opinion, the County Charter, Montgomery County's "constitution," may prescribe a limitation on the Council's actions through a supermajority requirement. Particularly in light of *Smallwood*, which approved proposed tax cap amendments to the charters of Anne Arundel and Baltimore Counties, there is no doubt that the citizens of Montgomery County are entitled to use the County Charter as a vehicle for imposing fiscal discipline on county government: "Limitations imposed by the people on their government are fundamental elements of a constitution." 327 Md. at 237. Just as a tax cap places an impediment to a county's receipt of revenue, so supermajority voting requirements for the approval of certain budget increases are an impediment to the spending of money. As the Court pointed out, "the Constitution of the United States, the Constitution of Maryland, and the Charters of Anne Arundel and Baltimore Counties are replete with provisions limiting the power of governments to raise *and appropriate* revenue." 327 Md. at 238 (footnotes omitted, emphasis added). In fact, the Court cited with evident approval provisions of the charters of both counties that contain supermajority requirements. 327 Md. at 238 n. 14. *See* §709 of the Anne Arundel County Charter and §716 of the Baltimore County Charter.

In *Smallwood*, the Court of Appeals also rejected the argument that the proposed tax cap conflicted with the provisions of public general law that generally authorized the counties to set the property tax rate. "There is no language in the statute indicating that reasonable limits cannot be placed on the legislative power to set the tax rate." 327 Md. at 243. In other words, the Court approved a charter limitation on a county council's exercise of authority granted by public general law. We have little doubt that the Court would likewise approve the restrictions imposed in §305 of the Montgomery County Charter.

## III

### Conclusion

In summary, it is our opinion that the spending affordability process in general, and the supermajority voting requirements in particular, in §305 of the Montgomery County Charter are authorized by the Maryland Constitution and do not conflict with any provision in the Education Article concerning the budgetary process for a community college. We do not comment, of course, on the policy merits of the current proposal to exclude certain non-county revenues raised by Montgomery College from the spending affordability process. This proposed exclusion is not required by State law, however.

> J. Joseph Curran, Jr.
> *Attorney General*
>
> Jack Schwartz
> *Chief Counsel*
>  *Opinions & Advice*